COURT OF APPEALS OF VIRGINIA

Present:   Judges AtLee, Athey and White
Argued at Lexington, Virginia


THOMAS AGEE FITZGERALD

                                                    MEMORANDUM OPINION* BY
v.        Record No. 0261-24-3               JUDGE CLIFFORD L. ATHEY, JR.
                                                         JUNE 3, 2025
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF DANVILLE
Joseph W. Milam, Jr., Judge

Elena Kagan, Assistant Public Defender (Catherine French
Zagurskie, Chief Appellate Counsel; Virginia Indigent Defense
Commission, on briefs), for appellant.

Jason D. Reed, Senior Assistant Attorney General (Jason S. Miyares,
Attorney General; Linda R. Scott, Senior Assistant Attorney General,
on brief), for appellee.


On December 5, 2023, a jury empaneled in the Circuit Court of the City of Danville

("trial court") convicted Thomas Agee Fitzgerald ("Fitzgerald") of one count of possessing a

firearm while possessing a Schedule I or II controlled substance in violation of Code

§ 18.2-308.4, one count of possessing a Schedule I or II controlled substance in violation of

Code § 18.2-250(A)(a), and one count of felony eluding in violation of Code § 46.2-817(B).  On

appeal, Fitzgerald assigns error to the trial court for 1) denying his motion to dismiss his

indictment for possessing a firearm while possessing a controlled substance, because he asserted

that, as applied, Code § 18.2-308.4 unconstitutionally infringes on his Second Amendment right

to possess a firearm; 2) finding sufficient evidence of constructive possession in the record to

_____

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

convict him of possessing cocaine; and 3) finding sufficient evidence to support convicting him of felony eluding. Finding no error, we affirm the trial court's judgment.

## I. BACKGROUND[1]

On January 27, 2023, officers from the Danville Police Department's Crime Deterrence Unit and Vice Narcotics Unit were engaged in "covert surveillance" of suspected drug dealer Derek Miller ("Miller"). Danville Police Sergeant Anthony Harn ("Sergeant Harn") was surveilling Fitzgerald's residence while seated in an undercover police cruiser. Miller, who was believed to be present at the residence, was observed along with Fitzgerald, and another individual "walking in and out of the house[,] walking to vehicles[,] then [after a] short time [returning] to [Fitzgerald's] residence" before departing. Sergeant Harn later testified that "for a good portion of the morning," Fitzgerald and Miller left the residence, then returned for "maybe a few minutes" before departing once again.

Later that afternoon, Danville Police Officer Greyson Taylor ("Officer Taylor"), along with three other uniformed officers, observed Fitzgerald driving a white 2022 Chevrolet Malibu near the residence with Miller riding in the front passenger seat. Officer Taylor, who was driving a "marked police vehicle," initiated a traffic stop of Fitzgerald's Chevy Malibu. Officer Taylor, who intended to apprehend Miller, pulled his marked police cruiser behind the Chevy Malibu occupied by Miller and Fitzgerald before activating his "blue [emergency] lights." Officer Taylor then activated his body-worn camera and along with another uniformed officer exited his patrol vehicle and attempted to effectuate the arrest of Miller. Another marked police

---

[1] On appeal, we review the evidence "in the 'light most favorable' to the Commonwealth, the prevailing party in the circuit court." *Konadu v. Commonwealth*, 79 Va. App. 606, 609 n.1 (2024) (quoting *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022)). Doing so requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Id.* (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)).

cruiser driven by Danville Police Officer Richard Marlowe ("Officer Marlowe") simultaneously arrived at the scene of the traffic stop and activated his dashboard camera, turned on his emergency lights, and pulled next to Officer Taylor's patrol car located behind the Chevy Malibu. Officer Marlowe then exited his police cruiser to assist in the apprehension of Miller.

Also approaching the scene on foot was Danville Police Officer D.C. Lancaster ("Officer Lancaster") who was clad in civilian attire, and "wearing a ballistic vest that said police." Officer Lancaster then knocked on the Chevy Malibu's front passenger window before opening the passenger door to seize Miller. Fitzgerald unexpectedly "backed [the Chevy Malibu] up" and "sped off" along with Miller so quickly that the officers heard tires "squealing." Although Officer Marlowe attempted to move his police cruiser to block Fitzgerald's Chevy Malibu from fleeing, Fitzgerald and Miller were able to escape. Sergeant Harn, who by then had reached the scene, observed Fitzgerald driving away at approximately "sixty miles an hour in a twenty-five mile per hour residential zone." Following the escape, law enforcement contacted a surveillance plane to locate and follow the Chevy Malibu as Fitzgerald and Miller fled from Danville. The plane eventually observed the fleeing vehicle passing through Pittsylvania County before reaching Lawless Creek Road in Blairs, Virginia.

Both Sergeant Harn and Officer Marlowe proceeded back to Fitzgerald's residence to wait for him to return home. Fitzgerald did eventually return to the residence but without Miller and driving a Kia Soul instead of the Chevy Malibu. When Fitzgerald returned, Sergeant Harn and Officer Marlowe activated their body-worn cameras, approached the residence, and subsequently arrested Fitzgerald. Sergeant Harn read Fitzgerald his *Miranda*[2] rights while the other police officers obtained a search warrant for Fitzgerald's residence. When Officer Lancaster arrived, he assisted in the search of the residence.

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Before commencing the search, Sergeant Harn asked Fitzgerald to identify his passenger in the Chevy Malibu and "if there would be any contraband located inside the residence." Fitzgerald first responded that "LD and his child were with him," "LD" being Fitzgerald's nickname for Miller. Fitzgerald also volunteered that he drove Miller "around from time to time" and that he "rents [vehicles] for [Miller]." Fitzgerald explained that he fled in the Chevy Malibu because "he did not see the lights behind him. Later, he admitted that he just got scared and drove off," eventually explaining to Sergeant Harn "that he seen the blue lights pull up behind him." In addition, Fitzgerald initially denied having any contraband in his residence but later admitted that he "smoked hard from time to time and that he usually smoked in the kitchen and if there was going to be any 'hard' it would be in the kitchen." Fitzgerald further volunteered that his gun rights had previously been restored following prior felony convictions. He then admitted that he kept a shotgun in his bedroom closet. Following that initial interview, the officers entered Fitzgerald's residence to execute the search while accompanied by Fitzgerald.

Once inside his home, Fitzgerald led the officers to his bedroom and showed them his shotgun stored in the bedroom closet. While Sergeant Harn retrieved the shotgun, Officer Lancaster observed "some white powder substance on the nightstand" in plastic baggies. Fitzgerald then "told [Officer Lancaster] it was cocaine," specifically identifying the substance as "crack cocaine." Fitzgerald also volunteered that there was "nothing more" in the residence and that he had previously "smoked some of it." Sergeant Harn collected the evidence, placed the contraband in an evidence bag, transported the evidence bag to police headquarters, and "placed it in the vault." Officer Lancaster later "sent it off" to the Virginia Department of Forensic Science ("DFS") to be tested for illegal substances.

Fitzgerald was then interviewed by Officer Lancaster and identified Miller from a picture before admitting that he had been buying cocaine from Miller for "approximately three months on and off." Fitzgerald also confessed that he had relapsed "this time for 3 to 4 years." When asked why he drove away from the earlier police stop, Fitzgerald stated that "[Miller] said drive, drive," and he obliged. Fitzgerald also advised that Miller knew Officer Lancaster by name from previous police encounters, that Miller knew that Officer Lancaster was the officer who approached the Chevy Malibu, and that as a result, Miller commanded Fitzgerald to "pull off," which meant to drive away to evade law enforcement. When asked why he drove the vehicle all the way to Blairs, Virginia, Fitzgerald responded that he did so because Miller "wanted him to drive that direction to lose law enforcement." When further asked about his relationship with Miller, Fitzgerald admitted that for three weeks he had rented vehicles for Miller and drove him around Danville in exchange for cocaine. At the conclusion of the interview, Fitzgerald was arrested. He was subsequently indicted by a grand jury for felony eluding on April 24, 2023, and for the two other felony offenses on June 26, 2023.

Following discovery, a jury trial on all three felonies was scheduled for December 5, 2023. On November 13, 2023, Fitzgerald moved to continue the jury trial and to dismiss the possession of a firearm while possessing a controlled substance indictment on the grounds that Code § 18.2-308.4 was unconstitutional as applied here under the Second Amendment. In support of his motion to dismiss, Fitzgerald asserted that criminalizing the constructive possession of drugs while possessing a firearm was not consistent with the historical tradition of firearms regulation because he had only constructively possessed both the firearm and the drugs. Citing the holding of the Supreme Court of the United States in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022), Fitzgerald contended that to justify regulation of an individual's right to keep and bear arms, the government "must demonstrate that the regulation is

consistent with this Nation's historical tradition of firearm regulation." He further contended in his motion to dismiss that the United States Supreme Court had yet to issue its decision in *United States v. Rahimi*, 602 U.S. 680 (2024), and that Fitzgerald believed that it was "likely that the decision in *Rahimi* will be instructive" when considering his motion to dismiss. The trial court held a hearing on both motions on November 28, 2023. At the hearing, Fitzgerald asserted that he was "not begging that the case be continued" but thought instead that "there may be some wisdom in seeing what they [the Supreme Court of the United States] have to say" and that he anticipated the Supreme Court of the United States would issue the decision in *Rahimi* in February. In further support of his motion to dismiss on constitutional grounds, Fitzgerald noted that the possession of his firearm occurred in his home, similar to the facts in *District of Columbia v. Heller*, 554 U.S. 570 (2008). Hence, he contended that the possession of the firearm by him was lawful since his gun rights had been restored. Following the hearing, the trial court opined that "the question[] it seems to me is . . . is possessing drugs something that the Second Amendment protects" and that *Bruen* made clear that the Second Amendment is limited to protecting the rights of "law abiding responsible citizens." The trial court further opined that it was "not sure that *Bruen* would protect someone who is possessing a firearm while at the same time . . . possessing illicit drugs."

The trial court subsequently denied both the motion to continue the trial as well as the motion to dismiss, reasoning that *Bruen* "made it clear that even with [Justice Thomas's] approach the Second Amendment is limited to protecting the right of 'law abiding responsible citizens.'" Hence, the trial court concluded that Fitzgerald's possession could be proscribed as he was found with "contraband such as illicit narcotics." Thus, the trial court declined to find the reasoning in *Heller* and *Bruen* compelled a finding that "the statute such as the one that we are dealing with that criminalizes the possession of firearms contemporaneous with or

simultaneously with narcotics" was unconstitutional when the drugs in question were found in the home. Therefore, the trial court ruled it was unnecessary to continue the jury trial to wait for a decision in *Rahimi*.

During the jury trial held on December 5, 2023, Sergeant Harn, Officer Taylor, Officer Marlowe, and Officer Lancaster, testified consistent with the aforementioned facts and events leading up to and including the arrest of Fitzgerald. The Commonwealth also moved the officers' body-worn camera footage into evidence, as well as the dashboard camera footage from Officer Marlowe's vehicle, all of which were published to the jury. In addition, Officer Taylor testified that the emergency lights on his marked police vehicle were visible from "three hundred and sixty degrees" around the vehicle and that his emergency lights were activated when he pulled behind Fitzgerald's Chevy Malibu. Sergeant Harn further testified that he had been a law enforcement officer for fifteen years, had participated in over 200 narcotics investigations, and that based upon his knowledge and experience, "hard" was "a reference to cocaine base[] which is also called crack cocaine." Both Sergeant Harn and Officer Lancaster also testified that based upon their experience and training as law enforcement officers, they were familiar with firearms in general and the shotgun they retrieved from Fitzgerald. Based upon that experience and training, both officers identified the shotgun as a device designed to expel projectiles by means of explosion. Officer Lancaster also further testified that based on his investigation, the Chevy Malibu driven by Fitzgerald had been rented by him from Enterprise Rental Cars. In addition, Steven Hokanson ("Hokanson"), a forensic scientist employed by the DFS at their Western Lab located in Roanoke, testified that he had analyzed the white powdery substance submitted to DFS by the law enforcement officers and confirmed the substance to be .5 gram of cocaine, which he noted is designated a Schedule II controlled substance. The certificate of analysis

prepared by Hokanson confirming the presence of cocaine in the sample was entered into evidence as well. The Commonwealth then rested its case.

Fitzgerald moved to strike the Commonwealth's evidence. First, with respect to the felony eluding indictment, Fitzgerald contended that the evidence failed to show that he was aware that emergency lights had been activated. Hence, he asserted that the Commonwealth failed to prove that he knew that law enforcement was attempting to execute a traffic stop when he drove away. Fitzgerald also asserted that the Commonwealth's evidence was insufficient to show he possessed the cocaine found in his bedroom because other people had been in the house that day, including Miller. The Commonwealth countered that Fitzgerald was speeding at more than 60 miles per hour in a residential area well in excess of the twenty-five mile per hour speed limit when fleeing the traffic stop. The Commonwealth also pointed out that Fitzgerald admitted to Sergeant Harn that he saw "the blue lights" before fleeing and endangering the lives of the law enforcement officers at the scene. The Commonwealth averred that the evidence showed that Fitzgerald, not someone else, possessed the cocaine found in baggies on the nightstand in his bedroom. The Commonwealth explained that Fitzgerald admitted ownership of the baggies multiple times, only qualifying his ownership by claiming that the cocaine contained within the baggies was a small amount for personal use. The Commonwealth also contended that whether the possession of cocaine along with the possession of a firearm occurred simultaneously was a question for the jury and that the jury had viewed video recordings along "with multiple admissions from the defendant."

The trial court denied Fitzgerald's motions to strike the Commonwealth's evidence, reasoning that sufficient evidence had been presented to support sending all three indictments to the jury since "the fact finder here is the jury. And so, we will let the jury decide." Fitzgerald declined to testify or present any evidence on his own behalf, instead he renewed his motion "on

the exact same grounds noting we are at proof beyond a reasonable doubt." The trial court again denied the renewed motion to strike, noting that "factual disputes" existed that were appropriate for resolution by the jury. The trial court then instructed the jury on the law applicable in the case prior to the parties' closing statements. The jury then retired to deliberate before returning its verdicts and convicting Fitzgerald on all three felony indictments.

The trial court subsequently sentenced Fitzgerald to nine years of incarceration with seven years and six months suspended.[3] Fitzgerald appealed.

II. ANALYSIS

A. *Standard of Review*

"This Court reviews arguments that a defendant's constitutional rights have been violated de novo." *Ginevan v. Commonwealth*, 83 Va. App. 1, 15 (2024). This includes "as-applied" challenges. *See Shin v. Commonwealth*, 294 Va. 517, 526 (2017) (noting the difference between facial and as-applied challenges, detailing that: "Before a litigant can mount a successful facial challenge to a statute, that litigant must first show 'that the statute in question is unconstitutional as applied to him.'" (quoting *Toghill v. Commonwealth*, 289 Va. 220, 228 (2015))). In such a challenge, the statute or rule in question is "examined in light of the facts of the case at hand." *Motley v. Va. State Bar*, 260 Va. 243, 247 (2000) (quoting *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988)). "All legislative acts are 'presumed to be constitutional.'" *Cnty. of Isle of Wight v. Int'l Paper Co.*, 301 Va. 486, 497 (2022) (quoting *Town of Ashland v. Bd. of Supervisors for Hanover Cnty.*, 202 Va. 409, 416 (1961)). And we have noted that "[t]his presumption is 'one of the strongest known to the law.'" *Ferguson v. Commonwealth*, 71 Va. App. 546, 557-58 (2020) (quoting *Boyd v. Cnty. of Henrico*, 42 Va. App. 495, 507 (2004) (en banc)). Accordingly, "[t]he

---

[3] At sentencing, Fitzgerald asked the court to set aside the verdict based on his previous arguments. The trial court did not rule on this motion but denied it by implication through proceeding with sentencing.

party challenging an enactment has the burden of proving that the statute is unconstitutional, and every reasonable doubt regarding the constitutionality of a legislative enactment must be resolved in favor of its validity." *Vesilind v. Va. State Bd. of Elections*, 295 Va. 427, 444 (2018).

In addition, "[w]hen an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). "We may not 'reweigh the evidence,' because we have no authority 'to preside de novo over a second trial.'" *Ervin v. Commonwealth*, 57 Va. App. 495, 503 (2011) (en banc) (first quoting *Nusbaum v. Berlin*, 273 Va. 385, 408 (2007); and then quoting *Haskins v. Commonwealth*, 44 Va. App. 1, 11 (2004)). Hence, "an appellate court reviews a lower court's findings of fact 'with the highest degree of appellate deference.'" *Commonwealth v. Wilkerson*, ___ Va. ___, ___ (Feb. 20, 2025) (quoting *Commonwealth v. Barney*, 302 Va. 84, 96 (2023)). "The judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680). "Thus, 'it is not for this [C]ourt to say that the evidence does or does not establish [the defendant's] guilt beyond a reasonable doubt because as an original proposition it might have reached a different conclusion.'" *Barney*, 302 Va. at 97 (alterations in original) (quoting *Cobb v. Commonwealth*, 152 Va. 941, 953 (1929)). Instead, the only relevant question for this Court on review "is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Womack v. Commonwealth*, 82 Va. App. 289, 295 (2024) (quoting *Barney*, 302 Va. at 97). In addition, "it is the *fact finder*, not this Court, that determines whether a defendant's hypothesis [of innocence] is reasonable." *Fary v. Commonwealth*, 77 Va. App. 331, 347 (2023) (en banc). "We [similarly] defer to the credibility findings of the [jury], as the fact finder." *Watts v. Commonwealth*, 57 Va. App. 217, 232 (2010). And "[t]his

deference . . . applies to all of the evidence, including video evidence." *Colas v. Tyree*, 302 Va. 17, 36 (2023).

      B. *Fitzgerald's constitutional challenge to Code § 18.2-308.4 is largely foreclosed by recent precedent and otherwise fails, as early English and American traditions of firearm regulation contain historical analogues for proscribing the possession of drugs and firearms.*

Fitzgerald first assigns error to the trial court for failing to dismiss his indictment for possessing a firearm while possessing a controlled substance, as he avers that Code § 18.2-308.4 is unconstitutional as applied to him. We disagree.

The Second Amendment of the United States Constitution provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.'" U.S. Const. amend. II. "'[T]he Second Amendment right is fully applicable to the States' through the Due Process Clause of the Fourteenth Amendment." *Ginevan*, 83 Va. App. at 8 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 744 (2010) (plurality opinion)). As noted by the Supreme Court of the United States, "the right to keep and bear arms is among the 'fundamental rights necessary to our system of ordered liberty.'" *Rahimi*, 602 U.S. at 690 (quoting *McDonald*, 561 U.S. at 778). And "[i]ndividual self-defense is 'the central component of the [Second Amendment] right itself,'" *Digiacinto v. Rector & Visitors of George Mason Univ.*, 281 Va. 127, 134 (2011) (quoting *Heller*, 554 U.S. at 598), which permits "law-abiding, responsible citizens to use arms in defense of hearth and home" as a core function, *Heller*, 554 U.S. at 635. "Nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Bruen*, 597 U.S. at 32. But, consistent with the Amendment's text, this right is "not unlimited," in that it is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 595; *see, e.g.*, *United States v. Jackson*, 555 F.3d 635, 636 (7th Cir.) ("The

Court said in *Heller* that the Constitution entitles citizens to keep and bear arms for the purpose of lawful self-protection, not for all self-protection."), *cert. denied*, 558 U.S. 857 (2009)

So, firearm possession may be regulated when "a firearm regulation is consistent with this Nation's historical tradition" as when this consistency is assured, "the individual's [proscribed] conduct falls outside the Second Amendment's 'unqualified command.'" *Bruen*, 597 U.S. at 24 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)). To make this determination, "[a] court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Watkins v. Commonwealth*, 83 Va. App. 456, 467 (2025) (alterations in original) (quoting *Rahimi*, 602 U.S. at 692).

Our recent decisions in *Ginevan* and *Watkins* comprehensively track the development of such limitations and how they have been decided from the Supreme Court's beginning approach to evaluating the Second Amendment's contours in *Heller* to recent opinions such as *Bruen* and *Rahimi*. Under step one of the two-prong test enumerated in *Bruen*, we first ask if "the Second Amendment's plain text covers an individual's conduct." *Ginevan*, 83 Va. App. at 9 (quoting *Bruen*, 597 U.S. at 17). In this inquiry, we must determine whether Fitzgerald "is a part of '"the people" whom the Second Amendment protects.'" *Id.* at 16 (quoting *Bruen*, 597 U.S. at 31-32). "If so, 'the Constitution presumptively protects that conduct,' and we must evaluate whether the Commonwealth has carried its burden to justify the regulation." *Watkins*, 83 Va. App. at 468. And "[u]nder the second prong of the *Bruen* test, th[is] burden is [for] the government to show that the gun prohibition it seeks to impose is consistent with the historical tradition of firearm regulation." *Ginevan*, 83 Va. App. at 21 (quoting *Bruen*, 597 U.S. at 17). "When assessing whether the government has met its burden, the Court is 'not obliged to sift the historical materials for evidence to sustain' the challenged law." *Watkins*, 83 Va. App. at 474 (quoting

*Bruen*, 597 U.S. at 60). "That is [the Government's] burden." *Id.* (quoting *Bruen*, 597 U.S. at 60). But we are not confined to only consider the authorities relied upon by the government as we have a "duty to follow binding precedent" whether cited by the government or not.[4] *Id.* (quoting *Jones v. Commonwealth*, 291 Va. 232, 242 (2016)). In evaluating the historical tradition in question, we, as this Court did in *Ginevan* and *Watkins*, may examine "regulations at the time the Second Amendment was adopted in 1791, or at the time the Second Amendment was incorporated against the states in 1868" consistent with the "ongoing scholarly debate" pertaining to which year was the appropriate reference point for the Second Amendment's "public understanding."[5] *Watkins*, 83 Va. App. at 474 (quoting *Ginevan*, 83 Va. App. at 22 n.17). Fitzgerald must prevail on both prongs in order to establish that Code § 18.2-308.4 is unconstitutional as applied to him. *See Ginevan*, 83 Va. App. at 16.

"As we [also] recently explained, 'it is important to note that *Bruen* does not require a 'historical twin' in order to permit governmental restrictions—only a historical analogue.'"

---

[4] Fitzgerald argues at length on brief that he should prevail on his constitutional challenge because the circuit court denied his motion to dismiss solely on consideration of *Bruen* and *Heller* before the Commonwealth's attorney below could provide historical analogues to the trial court to support the constitutionality of Code § 18.2-308.4 in response to Fitzgerald's motion to dismiss his charges, in line with the principle of party presentation. But *Bruen* did not change this calculus, contrary to Fitzgerald's position. To wit, the *Bruen* majority opined that under the party presentation principle "[c]ourts are . . . *entitled* to decide a case based on the historical record compiled by the parties." *Bruen*, 597 U.S. at 25 n.6 (emphasis added). And as courts are "entitled" to decide a case based on the parties' record, it is plainly implied they are also entitled to not do so. We said as much in *Watkins*, in this exact situation, holding that *Bruen* did not "intend[] to confine appellate courts to consider only the historical analogues provided at the trial level by line prosecutors" and, as a result, the Commonwealth was permitted to provide additional authorities to support its legal arguments on appeal. *Watkins*, 83 Va. App. at 475 n.18. Thus, we will consider the arguments of the parties, and "our own precedent [and] decisions from the myriad of other courts facing similar questions" in analyzing this case. *Id.*

[5] "Indeed, the Supreme Court has not yet decided whether individual rights are defined by their public understanding at the time of the ratification of the Bill of Rights in 1791 or the Fourteenth Amendment in 1868." *Range v. Att'y Gen. of U.S.*, 69 F.4th 96, 112 (3rd Cir. 2023) (Ambro, J., concurring).

*Watkins*, 83 Va. App. at 467 (quoting *Ginevan*, 83 Va. App. at 27). Hence, "[t]o prevail, the government need not show that the current law is a 'dead ringer' for some historical analogue." *Rahimi*, 602 U.S. at 708-09 (Gorsuch, J., concurring) (quoting *Bruen*, 597 U.S. at 30). "Why and how the regulation burdens the right are central to this inquiry." *Watkins*, 83 Va. App. at 468 (quoting *United States v. Connelly*, 117 F.4th 269, 274 (5th Cir. 2024)); Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1537 (2009) (distinguishing among "who," "what," "where," "when," and "how" restrictions). The analysis is performed through the use of "analogical reasoning" that focuses on determining whether a "historical regulation [and a] . . . distinctly modern firearm regulation . . . are 'relevantly similar.'" *Bruen*, 597 U.S. at 28-29 (quoting Cass Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993)).

"The 'why' analysis instructs that 'if laws at the Founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category' of firearms regulation." *United States v. Daniels*, 124 F.4th 967, 972 (5th Cir. 2025) (quoting *Connelly*, 117 F.4th at 274). "But the 'how' analysis warns that 'a law . . . may not be compatible with the right if it [is regulated] to an extent beyond what was done at the Founding,' 'even when that law regulates arms-bearing for a permissible reason.'" *Id.* (alterations in original) (quoting *Connelly*, 117 F.4th at 274). "'[C]hallenged and historical laws' are [thus] relevantly similar if they 'both (1) address a comparable problem (the "why")' and (2) 'place a comparable burden on the right holder (the "how").'" *Watkins*, 83 Va. App. at 468 (first alteration in original) (quoting *Connelly*, 117 F.4th at 274).[6]

---

[6] As Fitzgerald lodges "an as-applied challenge" against Code § 18.2-308.4, "the precise facts of the case play a crucial role in the legal analysis and holding," including the application of

- 14 -

In *Ginevan*, this Court applied the *Bruen* framework to analyze the constitutionality of Code § 18.2-308.2, a violent felony under Code § 17.1-805(C), which proscribes the possession of a firearm by a convicted felon. 83 Va. App. at 27. There, the defendant was involved in a "domestic disturbance" and was found in a residence by law enforcement after allegedly pointing a shotgun at a woman. *Id.* at 5. The defendant "admitted that there was a gun in his possession but denied pointing it at the woman," "claim[ing] that he felt threatened by the woman's statements [during the dispute] and had possession of the firearm for personal safety," though he "admitted that he was a convicted felon, a claim which the officers verified." *Id.* Challenging the constitutionality of Code § 18.2-308.2 as applied to him, the defendant averred that the provision was "inconsistent 'with our Nation's historical tradition of firearm regulation'" because "the federal law prohibiting all felons from possessing firearms was not enacted until 1961, and prior to that '[t]he earliest version of a federal statute, the Firearms Act of 1938, applied only to felons convicted of murder, rape, kidnapping, and burglary.'" *Id.* at 6 (alteration in original). Thus, the defendant contended that because "both statutes were enacted 'long after the period . . . *Bruen* told courts to consider[,]'" Code § 18.2-308.2 had "no longstanding analogue." *Id.* (alterations in original).

We disagreed with the defendant, holding that "[a] review of English history, the American period prior to the Founding, and our post-civil war era demonstrates persuasively that restrictions on gun possession were broadly permitted against those who were judged to pose a danger to the public."[7] *Id.* at 27. The regulations found by the Court to support Code

case law to the facts. *McKeithen v. City of Richmond*, 302 Va. 422, 438 (2023). In fact, as both *Ginevan* and *Watkins* both involved "as-applied" challenges, a discussion of the facts before this Court in both cases is essential to determining the application of those cases to the case at bar.

[7] We assumed without deciding that the Second Amendment's plain text that enumerates—a "right of the people"—presumptively covers the possession of a firearm by a

§ 18.2-308.2 canvassed a great deal of analogues, including "loyalty" and "oath" based regulations in the late 1600's that disarmed those who declined to declare fealty to the Church of England or the Crown and those otherwise determined to be "dangerous to the Peace of the Kingdome." *Id.* at 23 (quoting An Act Declaring the Rights and Liberties of the Subject and Settling the Succession of the Crown, 1 W. & M., Sess. 2, c. 2, § 7 (1689)); 12 Car. 2, c. 3 (Eng.)). We noted at length that these English regulations spawned numerous similar regulations in the United States and Virginia throughout the relevant time period, before 1776 and through to the late 1880s, that proscribed those deemed "dangerous" from possessing firearms. *Id.* at 21-28 (summarizing and analyzing authorities). Thus, though we concluded that the defendant was not off base in "point[ing] out that there were no outright gun bans based on felony status at the time of the Founding," *id.* at 26, we concluded that in light of the historical record, this did not matter for purposes of the *Bruen* analysis and that Code § 18.2-308.2 was constitutional as applied to violent felons. *See id.* at 27.

Shortly thereafter, in *Watkins*, we addressed an as-applied challenge to Code § 18.2-308.4,[8] which proscribes the simultaneous possession of both a "controlled substance" and "any firearm." 83 Va. App. at 473. There, the defendant was found by law enforcement in actual possession of a shotgun upon returning to his house "intoxicated" from a party at a friend's house. *Id.* After law enforcement arrested the defendant outside his house for "public intoxication," officers searched his person "and found a plastic baggie of white powder, which later tested positive for cocaine." *Id.* And when questioned by the officers on "what the

---

felon, as we found the defendant could not "prevail on the historical test," saving that question for a different case. *Ginevan*, 83 Va. App. at 20.

[8] The defendant in *Watkins* also challenged the constitutionality of Code § 18.2-308.2, but we found that challenge foreclosed by the holding and reasoning in *Ginevan*. *Watkins*, 83 Va. App. at 473.

substance was, [the defendant] responded, 'You know I do coke,'" before he was charged with violating Code § 18.2-308.4.[9]  *Id.*  Challenging the constitutionality of Code § 18.2-308.4 as applied to him, the defendant contended that his firearm-related conduct was covered by the plain text of the Second Amendment and that there were no historical analogues for the statutes under which he was charged.  *Id.* at 465.

We disagreed, holding that "Code § 18.2-308.4 is constitutional as applied to [the defendant], an admitted user of cocaine."  *Id.*  In support of this holding, we reasoned that Code § 18.2-308.4 was supported by

> three categories of historical regulations . . . as . . . analogues to modern restrictions on the possession of firearms by drug users: (1) laws that generally prohibited people from using firearms in a dangerous manner; (2) prohibitions on intoxicated persons carrying guns; and (3) laws that prohibited persons with mental illness from possessing firearms.

*Id.* at 478.  Again, "[a]s we did in *Ginevan*, we assume[d] without deciding that the Second Amendment's plain text protecting a 'right of the people' presumptively covers a felon's possession of a firearm" as it did not affect the outcome.  *Id.* at 474.  Though we recognized that "the evidence of a historical tradition of specifically prohibiting the use of intoxicants and firearms is thin on its own[] . . . such evidence is relevant as specific instances of the more broadly established tradition of disarming dangerous individuals" in which category drugs users fall.  *Id.* at 479-80 (summarizing historical authorities).  Thus,

> [i]n comparing the "how" and "why" of these regulations to the statute at hand, we f[ound] a "common thread . . . [of] legislative response to the heightened danger to the public arising from the possession of a gun by an individual who, because of a mental condition or due to current use of alcohol or illegal drugs, may be less stable than we rightfully expect those who possess and use guns to be."

---

[9] It is unclear from the record in *Watkins* whether the defendant was under the influence of the substance he possessed or a different substance altogether.

*Id.* at 478 (alterations in original) (quoting *United States v. Lewis*, 650 F. Supp. 3d 1235, 1241 (W.D. Okla. 2023)). And this conclusion constituted a sufficient analogue for purposes of *Bruen*. *See id.* The *Watkins* Court left for another day "the question of whether there are sufficient historical analogues to disarm everyone else who merely possesses (either actually or constructively) both a controlled substance and a firearm," chambering its decision to cases where the defendant is a current drug user. *Id.* at 481 n.24.

Here, we are faced with a similar but distinct as-applied challenge from what was before the Court in *Ginevan* and *Watkins*. Fitzgerald's assignment of error contends that Code § 18.2-308.4, analyzed previously in *Watkins*, unlawfully burdens his Second Amendment right to possess a firearm *within his home* in which he was alleged to constructively possess both the firearm and substance in question. To begin, the statutory scheme in question is as follows:

> Code § 18.2-308.4(A) makes it "unlawful for any person unlawfully in possession of a controlled substance classified in Schedule I or II . . . to simultaneously with knowledge and intent possess any firearm." A violation of this subsection is a Class 6 felony. Should someone unlawfully possess such a controlled substance and "simultaneously with knowledge and intent possess any firearm on or about his person," a two-year mandatory minimum term of imprisonment applies. Code § 18.2-308.4(B). An enhanced mandatory minimum applies when the firearm is possessed "while committing or attempting to commit the illegal manufacture, sale, distribution, or the possession with the intent" to do the same. Code § 18.2-308.4(C).

*Watkins*, 83 Va. App. at 473 (alteration in original). This statute proscribes a temporary loss of gun rights when and where a person possesses such a substance while *simultaneously* knowingly and intentionally possessing the firearm in question. *See id.*

Fitzgerald claims that he satisfies the first prong of *Bruen* because "the United States Supreme Court has held that 'individual self-defense is the central component of the Second Amendment right' and the need of self-defense is 'most acute in the home,'" *McDonald*, 561 U.S. at 767, and the shotgun in question was found in his bedroom, thus causing him to fall

within "the people" protected by the Second Amendment. Further, in arguing that the Commonwealth cannot satisfy its burden under *Bruen*, Fitzgerald boldly claims that "[t]here is no history and tradition, either at the Founding or during the Reconstruction era, of preventing citizens from constructively possessing firearms while in constructive possession of drugs." Again, assuming without deciding that Fitzgerald is among "the people" protected by the Second Amendment, we find his argument pertaining to the historical tradition of regulating drugs and firearms misguided.

We find that our decisions in *Watkins* and *Ginevan*, and the Supreme Court of the United States's opinions in *Heller* and *Rahimi*, show that the right to keep and bear arms in the home for self-defense does not include the right to concurrent drug and firearm possession, *even where the arms in question are found in the home* not on the defendant's person. *Heller*, 554 U.S. at 607-08. Foremost, as noted by the Court in *Heller*, William Rawle, "a prominent lawyer who had been a member of the Pennsylvania Assembly that ratified the Bill of Rights," noted in his influential treatise on the Second Amendment that the right provided by this Amendment ought not "be abused to the disturbance of the public peace," such as by assembling with other armed individuals "for an unlawful purpose." *Id.* (quoting William Rawle, *A View of The Constitution of The United States of America* 123 (2d ed. 1829)). To wit, in discussing the ratification of the Second Amendment in Pennsylvania, a group of Anti-Federalists who called themselves "The Dissent of the Minority" proposed a change to the Amendment's text that stated:

> [T]he people have a right to bear arms for the defence of themselves and their own State or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them unless *for crimes committed*, or real danger of public injury from individuals. [10]

---

[10] In interpreting the Second Amendment, "[a]lthough one might question why we should listen to the debate's 'losers,' the Anti-Federalist Papers are relevant for the same reason that the

2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 665 (1971) (emphasis added); *United States v. Brown*, 715 F. Supp. 2d 688, 697 (E.D. Va. 2010) (analyzing this putative amendment text post-*Heller*). While this amended text was not adopted, it is important because, read in the context of traditional Anglo-American firearm laws, it reflects the understanding of the Founding generation—particularly among those who favored enshrining the right to armed self-defense in the Constitution—that "crimes committed," whether dangerous or not, justified disarmament, thus precluding any notion that one would have a Second Amendment right to possess a firearm *while committing a criminal offense*.[11] *See Rawle*, *supra*, at 126.

---

Federalist Papers are: . . . 'their writings, like those of other intelligent and informed people of the time, display how the text of the Constitution was originally understood,'" informing our understanding of the Amendment. Amul R. Thapar & Joe Masterman, *Fidelity and Construction*, 129 Yale L.J. 774, 797 (2020) (quoting Antonin Scalia, *A Matter of Interpretation: Federal Courts and the Law* 38 (Amy Gutmann ed., 1997)).

[11] To be sure, we do not find from these sources that the Second Amendment's protections only extend to those deemed *virtuous*. *See United States v. Rene E.*, 583 F.3d 8, 16 (1st Cir. 2009) (noting that "In the parlance of the republican politics of the time, these [type of] limitations were sometimes expressed as efforts to disarm the 'unvirtuous.'" (quoting Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461, 480 (1995))); Robert E. Shalhope, *The Armed Citizen in the Early Republic*, 49 Law & Contemp. Probs. 125, 130 (1986) (discussing the view of late-seventeenth century republicanism that "[t]he right to arms was to be limited to virtuous citizens only. Arms were 'never lodg'd in the hand of any who had not an Interest in preserving the publick Peace . . . .'" (quoting J. Trenchard & W. Moyle, *An Argument Shewing, That a Standing Army Is Inconsistent with a Free Government, And Absolutely Destructive to the Constitution of the English Monarchy* 7 (1697))). "Indeed, [to do so by] mapping colonial analogues [of such virtue without critical analysis] onto the Constitution as it exists today would produce incongruous results—while men who beat their wives would remain free to own guns, Catholics and African-Americans, among others, would have no Second Amendment rights." *Brown*, 715 F. Supp. 2d at 698. Nor could we do so as we have only recognized for now that such prohibition, applies to those convicted of violent felonies, instead of felons in general, *Ginevan*, 83 Va. App. at 28, and there are arguments that suggest nonviolent felons should not be disarmed. Nelson Lund, *The Second Amendment and the Right to Bear Arms After D.C. v. Heller: The Second Amendment, Heller, and Originalist Jurisprudence*, 56 UCLA L. Rev. 1343, 1357 (2009) ("On what understanding . . . does it make any sense to leave American citizens defenseless in their own homes for the rest of their lives on the basis of nothing more than a nonviolent felony like tax evasion or insider trading? It would make more sense to say that the government may silence these felons for the rest of their lives— regulatory crimes, after all, usually involve an abuse of speech."). Our only finding is that there

This conclusion was first noted in passing by the United States Supreme Court years before. *United States v. Cruikshank*, 92 U.S. 542, 553 (1875) (noting this restriction). And the *Heller* Court explicitly adopted the same condition before it was propounded in *Bruen*. 597 U.S. at 2-3 ("The Second Amendment 'is the very product of an interest balancing by the people,' and it 'surely elevates above all other interests the right of *law-abiding*, responsible citizens to use arms' for self-defense." (emphasis added) (quoting *Heller*, 554 U.S. at 635)). And this conclusion has not been called into question since. *See Rahimi*, 602 U.S. at 701-02 (noting the issues with the term "[r]esponsible" as a descriptor for "the class of ordinary citizens who undoubtedly enjoy the Second Amendment right" in the rule delineated by *Heller* and *Bruen* but not discussing the "law-abiding" requirement). Thus, per this precedent, the Second Amendment right must be undergirded at core by the requirement that the person in question possessing the firearm not possess it for an unlawful purpose. But how does the person possessing a firearm in the context of Code § 18.2-308.4 do so unlawfully where the drug is not found on their person but instead in their "constructive possession?"

The Seventh Circuit Court of Appeals examined that question post-*Heller* in *Jackson v. United States* in analyzing the federal prohibition against possession of a firearm in furtherance of drug trafficking under 18 U.S.C. § 924(c). 555 F.3d at 636 (Easterbrook, C.J.). In that case, the defendant "was distributing illegal drugs (cocaine and unlicensed dextromethorphan hydrobromide tablets) out of his home" and law enforcement "found the guns [in question] in the bedroom of his apartment, while the drugs were prepared, kept, and sold in other rooms." *Id.* In justifying his possession, the defendant stated to law enforcement that "he lived in a dangerous neighborhood and wanted to protect himself from burglars and other marauders" in line with the

is no traditional Second Amendment right to possess a firearm during the commission of a *separate* crime for purposes of the Second Amendment, consistent with precedent.

Second Amendment's protections. *Id.* To wit, the defendant in speaking of what he meant by "protection" a federal drug-control agent's report found the term "protection" to mean: "protection of the drug business, for that is where the principal risk lies [as] [d]rug dealers are much more likely to be robbed by suppliers and customers than a householder chosen at random is apt to be the subject of burglary." *Id.* And the report noted that this result occurs "because the suppliers and customers know that the drug purveyor can't turn to the police for help[,] . . . mak[ing] dealers especially attractive targets." *Id.* But the defendant's concerns did not convince the Seventh Circuit, which plainly held:

> The Constitution does not give anyone the right to be armed while committing a felony, or even to have guns in the next room for emergency use should suppliers, customers, or the police threaten a dealer's stash.

*Id.* The Seventh Circuit further underscored the validity of drug-related firearm restrictions in its holding with a hypothetical:

> Suppose a federal statute said: "Anyone who chooses to possess a firearm in the home for self-protection is forbidden to keep or distribute illegal drugs there." Such a statute would be valid . . . . And if Congress may forbid people who possess guns to deal drugs, it may forbid people who deal drugs to possess guns. The statements "if you have a gun, you can't sell cocaine" and "if you sell cocaine, you can't have a gun" are identical.

*Id.* And the reason why the result would be the same is that "there is no constitutional problem with separating guns from drugs[.]" *Id.* Of course, the defendant would have otherwise been able to exercise the right to use a firearm to defend his residence as provided in *Heller*. *See id.* But "his decision to operate an illegal home business also matter[ed]" in that "he possessed the guns to protect himself while at home—and it was *from his home* that he distributed illegal drugs." *Id.* Hence, under *Jackson*, where a defendant undertakes an action at home for a criminal purpose, their possession of a firearm in defense of the home itself is not protected under the Second Amendment as "[t]o hold the contrary would suggest that the Second

Amendment protects an individual's right to possess a weapon *for criminal purposes*." *United States v. Greeno*, 679 F.3d 510, 520 (6th Cir. 2012) (emphasis added) (applying *Jackson*, holding that a sentencing guideline enhancement for weapon possession during a drug offense was "consistent with the historical understanding of the right to keep and bear arms, which did not extend to possession of weapons for unlawful purposes"), *overruled in part by Bruen*, 597 U.S. at 31-32.[12]

Though Fitzgerald was not convicted of drug dealing, the Seventh Circuit's reasoning is particularly persuasive as applied to the facts in this case as it demonstrates the underlying *dangerousness* stemming from concurrent drug and firearm possession, even in the *constructive sense*, consistent with our findings in *Ginevan* and *Watkins*. *See Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting) ("History is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns."). Consistent with *Ginevan*, "Keeping guns away from habitual drug abusers is analogous to disarming felons." *United States v. Yancey*, 621 F.3d 681, 684 (7th Cir. 2010). And this "dangerousness" stems from a panoply of underlying issues, some of which were highlighted in *Jackson*. As we found in *Watkins*, there is a "heightened danger to the public arising from the possession of a gun by an individual who, because of a mental condition or due to current use of alcohol or illegal drugs, may be less stable than we rightfully expect those who possess and use guns to be." 83 Va. App. at 478 (quoting *Lewis*, 650 F. Supp. 3d at 1241). And our finding there was entirely consistent with other similar findings by this Court, which has also previously "acknowledged the commonsense 'relationship between the distribution of controlled substances . . . and the possession and use of dangerous weapons.'" *Thomas v. Commonwealth*, 44 Va. App.

---

[12] The decision in *Greeno* was partially overruled by *Bruen* in that it applied the "means-ends" test disposed of by that case. That case's historical analysis and application of Jackson were left unaffected by *Bruen* for our purposes.

741, 755 (quoting *Logan v. Commonwealth*, 19 Va. App. 437, 445 (1994) (en banc)), *adopted upon reh'g en banc*, 45 Va. App. 811 (2005).  And this Court has also observed in a variety of contexts that "the connection between illegal drug operations and guns in our society is a tight one."  *Bolden v. Commonwealth*, 49 Va. App. 285, 293 (2007) (quoting *Jones v. Commonwealth*, 272 Va. 692, 701 n.3 (2006)).  Thus, as, "[g]uns are the 'tools of the trade' in the underground drug world," it makes sense that disarming drug users would serve a crime prevention purpose centered on the dangerousness of simultaneous possession.[13]  *Thomas*, 44 Va. App. at 755 (quoting *United States v. White*, 875 F.2d 427, 433 (4th Cir. 1989)).

Here, the record reflects that Fitzgerald was a *current* drug user who was employed by Miller, a suspected dealer, in return for drugs.  He admitted to law enforcement that he "smoked hard from time to time."  He further told the officers that he had been buying cocaine from Miller for "approximately three months on and off."  And he conceded that he had relapsed "this time for 3 to 4 years" since previously getting clean.  He also admitted to the officers that at the time of the incident he had been working for Miller for three weeks, renting vehicles for him and driving him around Danville in exchange for cocaine.

In addition to his drug use, the record also shows that the justification for the search in question was Fitzgerald's conduct in evading law enforcement earlier on the day in question—

_____

[13] As noted in *Watkins*, this dangerousness justification has been noted through federal courts as grounds for supporting the constitutionality of the federal analogue to Code § 18.2-308.4: 18 U.S.C. § 922(g)(3).  83 Va. App. at 475; *United States v. Seay*, 620 F.3d 919, 925 (8th Cir. 2010) ("[I]n passing [18 U.S.C.] § 922(g)(3), Congress expressed its intention to 'keep firearms out of the possession of drug abusers, a dangerous class of individuals.'"); *United States v. Cheeseman*, 600 F.3d 270, 279 (3d Cir. 2010) ("[W]e are convinced that a strengthened [firearms control system] can significantly contribute to reduc[ing] the danger of crime in the United States.  No one can dispute the need to prevent drug addicts, mental incompetents, persons with a history of mental disturbances, and persons convicted of certain offenses from buying, owning, or possessing firearms.  [18 U.S.C. § 922(g)(3)] seeks to maximize the possibility of keeping firearms out of the hands of such persons." (quoting *Huddleston v. United States*, 415 U.S. 814, 828 (1974))).

speeding away from the officers' attempting to arrest Miller and fleeing out of Danville before eventually returning home. As a result of these actions, Fitzgerald put law enforcement on notice that he may attempt dangerous feats to escape their grasp, another fact weighing against whether his possession of the firearm was as a law-abiding citizen. Hence, these facts show that Fitzgerald, by his use of drugs and dangerous conduct, falls directly within the ratio decidendi of our decision in *Watkins*,[14] causing the constitutionality of Code § 18.2-308.4 as applied to his facts to be supported by the justifications raised in that case. But those justifications are not the only support for the constitutionality of Code § 18.2-308.4 under these facts.

Further, we also find that there is a sufficient historical analogue for Code § 18.2-308.4 in the historical prohibition against possessing firearms while smuggling contraband. And this relationship is most clear when juxtaposed with the history of controlled substances being considered "contraband," namely the tradition of regulating alcohol use and possession.[15] As noted in *Watkins*, Founding-era laws concerning guns and alcohol were few and primarily concerned with (1) misuse of weapons while intoxicated and (2) disciplining state militias for

---

[14] "Under the interpanel-accord doctrine, the decision of a prior panel of this Court 'becomes a predicate for application of the doctrine of stare decisis' and cannot be overruled except by the Court of Appeals sitting en banc or by the Virginia Supreme Court." *Johnson v. Commonwealth*, 75 Va. App. 475, 481 (2022) (quoting *Butcher v. Commonwealth*, 298 Va. 392, 397 n.6 (2020)). "The interpanel-accord doctrine 'applies not merely to the literal holding of the case, but also to its *ratio decidendi*—the essential rationale in the case that determines the judgment.'" *Id.* (quoting *Clinchfield Coal Co. v. Reed*, 40 Va. App. 69, 73 (2003)); *see, e.g.*, *Womack*, 82 Va. App. at 303 (analyzing and applying the ratio decidendi of Supreme Court of Virginia precedent). We conclude that *Watkins* does not entirely foreclose Fitzgerald's challenge due to where and the manner the firearm and substance were found, but as our decision must be consistent with its reasoning, we are not permitted to adopt Fitzgerald's position that his case is entirely distinguishable from *Watkins*.

[15] There was very little regulation of drugs (related to firearm possession or otherwise) until the late 19th century, so intoxication via alcohol has been generally raised as the next-closest "historical analogue" that we can look to. *See, e.g.*, David F. Musto, *The American Experience with Stimulants and Opiates*, 2 Persps. on Crime & Just. 51, 51 (1998) ("[M]ost [non-alcoholic] drugs were not familiar products early in the 19th century . . . .").

having alcohol present at their activities. *See Watkins*, 83 Va. App. at 478. Statutory action was required to regulate alcohol consumption and sales as "[t]he sale of intoxicating liquors, [was] perfectly lawful for licences at common law." Earl of Halsbury, *Laws of England: Being a Complete Statement of the Whole Law of England* 8 (1911) (citing *Reg. v. Fawkner*, 2 Keble, 506, 506, 84 Eng. Rep. 318, 318 (K.B. 1669)). But American regulation regarding alcohol, either outright banning it through the enacting of a "Maine Law" or heavily proscribing its use, was present in several states during the Founding-era through to Reconstruction. Robert C. Pitman, *The History of Prohibition*, *in*, Alcohol and the State: A Discussion of the Problem of Law as Applied to the Liquor Traffic 292, 300-05 (1880) (noting that from 1846 through the 1870s, at least nine states adopted and maintained laws criminalizing the possession, sale, or distribution of alcohol, in response to a temperance movement that started in Maine in 1830).

Correspondingly, at the time of the Founding, Blackstone detailed that in England, "[s]muggling, or the offence of importing goods without paying the duties imposed thereon by the laws of the customs and excise," was proscribed as a felony offense where "three or more persons . . . assemble[d], with firearms or other offensive weapons, to assist in the illegal exportation or importation of goods, or in rescuing the same after seizure." 4 William Blackstone, *Commentaries* \*155. Another commentor on the statute noted that this offense also punished those that "maliciously [shot] at . . . any officer while in the *due* execution of his duty" who also "conceal[ed] spirits or tobacco, . . . tea[,] or manufactured silk."[16] John Wade, *Cabinet*

_____

[16] This offense was prosecuted both for shipping goods without paying the import duty and for bringing such goods into the United States mainland by ship or other means. Smuggling had close relation to the offense of "clandestine introduction," which provided "penalties for various acts tending to lead up to the carrying from English soil of goods prohibited to be exported," which was a misdemeanor, not a felony. *Keck v. United States*, 172 U.S. 434, 446-47 (1899) (quoting 1558, 1 Eliz. ch. 11). An action for condemnation on the grounds of smuggling activity also lay against the vessel captured containing the contraband as an act of fraud against the government. *United States v. Hipkin*, 26 F. Cas. 325, 327 (D. Va. 1808) ("Frauds against the

*Lawyer: A Popular Digest of the Laws of England* 396-98 (1867).  Such "goods" and others were

known to the Founders as being considered "contraband," where proscribed by an act of the King

or Parliament.  *Contraband Goods*, 1 T.E. Tomlins, *The Law Dictionary, Defining and*

*Interpreting the Terms or Words of Art and Explaining the Rise, Progress, and Present State of*

*the English Law* (1810) (defining "contraband goods" as "those which are prohibited by an act of

parliament, or the king's proclamation"); Edward Earl of Clarendon & Whitlock Bulstrode, *Lives*

*of All the Lords Chancellors, Lords Keepers, and Lords Commissioners, of the Great Seal of*

*England* 242-44 (1708) (noting "[t]hat Pitch, Tar, and Hemp," though normally considered

"Civil Things," were "Contraband Goods" under certain edicts, which one in particular also

provided "that Guns were also useful to kill Birds, and yet were esteemed [as] Contraband

Goods" all the same for that reason).  And what was deemed "contraband" was also known to the

Founders to change with the circumstances and the decisions of the legislature.  *Contraband*, 1 J.

J. S. Wharton, *The Law Lexicon, or Dictionary of Jurisprudence: Explaining All the Technical*

*Words and Phrases Employed in the Several Departments of English Law, Including also the*

*Various Legal Terms Used in Commercial Transactions; Together with an Explanatory as well*

*as Literal Translation of the Latin Maxims Contained in the Writings of the Ancient and Modern*

*Commentators* (1848) (adopting the similar definition of "contraband" while noting "it is

sufficiently evident that an article which might not be contraband at one time, or under certain

circumstances, may become contraband at another time, or under different circumstances").

---

public revenue by smuggling, being the only mischief which such vessels were capable of committing, the condition of the execution by those concerned in a licensed vessel referred to this object, and to none other.")  This principle was later applied to businesses convicted of producing illicit alcohol.  *See Dobbins's Distillery v. United States*, 96 U.S. 395, 403-04 (1877) (holding that "the unlawful acts of the distiller bind the owner of the property, in respect to the management of the same, as much as if they were committed by the owner himself").

Further, at the time of the Founding and Reconstruction, a conviction for the offense of smuggling and thereby possessing such "contraband" resulted in both the forfeiture of the contraband *and* any weapons possessed by the accused, whether in personal capacity or in an alleged conspiracy. *Talbot v. Commanders & Owners of Three Brigs*, 1 U.S. (1 Dall.) 95, 97 (1784) (noting that upon capturing a vessel suspected of containing smuggled goods, "[t]he commanders of the three brigs . . . took out of her two cannon, small arms, powder, ball, two coils of cordage, and some other articles"); *Church v. Hubbart*, 6 U.S. (2 Cranch) 187, 232 (1804) (Marshall, C.J.) (distinguishing the different offenses that proscribed "acts of illicit trade which subject [contraband] to seizure and confiscations without the landing of the goods" in that "Smuggling is indeed said to be the landing or running of goods contrary to law"), *superseded by statute on other grounds*; *Hadfield v. Jameson*, 16 Va. 53, 69 (1809) (Tucker, J.) (noting that confiscation of smuggled coffee from a company was proper where "the master of a ship [was caught] smuggling on his own account, without the privity of the owners"). Later, similar laws were developed to specifically combat the unlawful production or distribution of distilled spirits throughout the United States—the practice of moonshining—which also heavily involved the use of firearms by its perpetrators.[17] *See, e.g.*, *Whited v. Commonwealth*, 174 Va. 528, 555 (1940) (reversing a sheriff's deputy's conviction for second-degree murder where he killed a man defending an "illicit still" and a "quantity of illicit alcohol" with a "double barreled shot gun"

---

[17] This practice at different points in history has been called "bootlegging" or "rum-running" and has been proscribed in Virginia under different regulatory schemes. *See Carroll v. United States*, 267 U.S. 132, 146 (1925) (noting the difficulty in enforcing the Eighteenth Amendment prohibition on alcohol due to the practice of "rum[-]running," which involved transportation of illegal alcohol by vehicle); *Quivers v. Commonwealth*, 135 Va. 671, 676 (1923) (affirming a defendant's conviction under the Mapp Prohibition law for the possession of alcohol, which provided, "It shall be unlawful for any person in this State to manufacture, transport, sell, keep, or store for sale, offer, advertise or expose for sale, give away or dispense or solicit in any way, or receive orders for or aid in procuring ardent spirits, except as hereinafter provided." (quoting 1918 Va. Acts ch. 578)).

where the evidence showed the officers were fired upon by the man and another defender of the still armed with a pistol before returning fire); *Hester v. United States*, 265 U.S. 57, 58 (1924) (discussing the open fields doctrine in the context of an underlying conviction for "concealing distilled spirits").

From the historical background, we conclude that the historical analogue to Code § 18.2-308.4 is the English smuggling felony described by Blackstone. As plainly noted by the United States Supreme Court and the Supreme Court of Virginia, "William Blackstone 'constituted the preeminent authority on English law for the founding generation.'" *Howell v. McAuliffe*, 292 Va. 320, 347 n.15 (2016) (quoting *Heller*, 554 U.S. at 593-94). And "[h]is Commentaries were 'heavily' relied upon by the Founders," *id.* (quoting Akhil Reed Amar, *America's Unwritten Constitution: The Precedents and Principles We Live By* 7 (2012)), who considered them "the most satisfactory exposition of the common law of England," *Taylor v. Commonwealth*, 58 Va. App. 435, 444 (2011) (quoting *Schick v. United States*, 195 U.S. 65, 69 (1904)). Hence, his representation of this felony would have been as the Founders knew it. In examining the offenses, the actus reus of both required the intentional and knowing possession of a firearm and the possession of contraband, which in the case of Code § 18.2-308.4 is a Schedule I/II controlled substance. *See* Blackstone, *supra*, *155. Both statutes regulated "firearm use to address particular problems," with this problem being the possession of the firearm to protect the contraband from discovery. *Connelly*, 117 F.4th at 274. And Code § 18.2-308.4 regulates firearms to a much more limited extent than this smuggling felony as Blackstone noted that courts "cannot surely be too cautious in inflicting the penalty of death" for that felony due to its effect on the English economy by facilitating illicit trade. *See* Blackstone, *supra*, *155. Under Code § 18.2-308.4, the offender is only disarmed where he possesses both the substance and the

weapon,[18] which are both indicative of involving in the illicit drug trade of which the smuggling offense is but an older and broader relative. It may not be a "dead ringer," but it is clearly a "historical analogue" for purposes of the *Bruen* analysis. *Rahimi*, 602 U.S. at 708-09 (Gorsuch, J., concurring) (quoting *Bruen*, 597 U.S. at 30). Therefore, Code § 18.2-308.4 in no way overburdens Fitzgerald's Second Amendment right in light of this historic tradition. Thus, as there is no historic evidence suggesting that persons had a right to possess firearms *during an offense*, and there is a proper historical analogue for Code § 18.2-308.4, the trial court was correct in concluding that the provision was constitutional as applied to Fitzgerald.

   C. *The record contains sufficient evidence to find Fitzgerald constructively possessed the drug in question.*

Next, Fitzgerald contends that the Commonwealth failed to introduce sufficient evidence to prove that he constructively possessed the baggies containing crack cocaine found on his bedside nightstand. Fitzgerald specifically relies on *Drew v. Commonwealth*, 230 Va. 471 (1986), and similar cases, to assert that the Commonwealth failed to prove constructive possession, as the evidence showed multiple people moving in and out of his residence and that

---

[18] Historically, though there was considerable discussion regarding the use of the common law doctrine of constructive offenses, the Founders did not appear to have a clear view in its application to the Constitution. To wit, Cesare Beccaria's theories of nullum crimen sine lege (no crime without a law) and nulla poena sine lege (no punishment without a law) in his work *Of Crimes and Punishments* (1764), which in part railed against this common law tradition was available to the Founders, who were aware of it, and it drew some adherents during Reconstruction. *See* A Code of Crimes and Punishments, intro. tit., ch. 1, pr., *reprinted in* 2 Edward Livingston, *The Complete Works of Edward Livingston on Criminal Jurisprudence* 3 (1873) (seeking to rid constructive offenses from the American jurisprudential lexicon). But it was also known to the Founders through legal practice that this common law doctrine existed lest "a great deal of fraud and villainy, and abuse and offence will escape unpunished." *Letter from Chancellor James Kent to Edward Livingston*, 16 Am. Jurist & L. Mag. 361, 363 (1837). Hence, as the Founders made no reference to a prohibition against constructive offenses, we take the possession offense proscribed by the smuggling felony statute described by Blackstone as being possible to prove with either actual or constructive possession evidence.

Fitzgerald was never found close enough to the nightstand to show he possessed the baggies. We disagree.

"Code § 18.2-250(A)(a) reads in relevant part: 'It is unlawful for any person knowingly or intentionally to possess a controlled substance . . . . Any person who violates this section with respect to any controlled substance classified in Schedule I or II of the Drug Control Act shall be guilty of a Class 5 felony.'"[19] *Christian v. Commonwealth*, 59 Va. App. 603, 608 (2012). "[T]o convict a person of illegal drug possession [under this provision], the Commonwealth must prove beyond a reasonable doubt that the [defendant] was aware of the presence and character of the drug and that the [defendant] consciously possessed it." *Yerling v. Commonwealth*, 71 Va. App. 527, 532 (2020). In proving this offense, "[p]roof of actual possession is not required; proof of constructive possession will suffice." *Id.* (quoting *Walton v. Commonwealth*, 255 Va. 422, 426 (1998)). "Constructive possession of drugs can be shown by 'acts, statements, or conduct of the accused or other facts or circumstances which tend to show that [he] was aware of both the presence and character of the substance and that it was subject to his dominion and control.'"[20] *Bagley v. Commonwealth*, 73 Va. App. 1, 27 (2021) (alteration in original) (quoting *Wilson v. Commonwealth*, 272 Va. 19, 27 (2006)). And "[p]ossession 'need not always be exclusive.'" *Durham v. Commonwealth*, ___ Va. ___, ___ (Aug. 1, 2024) (quoting *Smallwood v. Commonwealth*, 278 Va. 625, 630 (2009)). Here, Fitzgerald does not contend that he did not have

---

[19] Pertinent here, and consistent with Hokanson's testimony, the General Assembly has denoted that cocaine, including its "crack" form, is a Schedule II controlled substance. Code § 54.1-3448.

[20] One such circumstance the fact finder may consider in determining whether the defendant possessed illegal drugs is the possession of a firearm. *See Bolden*, 49 Va. App. at 293; *Logan*, 19 Va. App. at 445 (holding that fact-finders may take into account "the relationship between the distribution of controlled substances . . . and the possession and use of dangerous weapons").

knowledge of the nature and character of the crack cocaine, he instead argues that the evidence in the record is insufficient to show he was aware, or had knowledge, of its presence in his room.

"While awareness is an essential ingredient in the crime of possession of narcotics, it may be proved by evidence of acts, declarations or conduct of the [defendant] from which the inference may be fairly drawn that he knew of the existence of the narcotics in the place where they were found." *Wymer v. Commonwealth*, 12 Va. App. 294, 300 (1991). In analyzing this requirement, the Supreme Court of Virginia has found a defendant's "presence in his own bedroom and the presence of the [contraband] at the time," where supported by attendant circumstances, can be sufficient evidence to support a finding of constructive possession. *Rawls v. Commonwealth*, 272 Va. 334, 350-51 (2006); *e.g.*, *Birdsong v. Commonwealth*, 37 Va. App. 603, 609-10 (2002) (affirming a constructive possession conviction where the contraband was found in a safe in the closet of the room owned and occupied by the defendant who was "the 'exclusive or primary' occupant of the room and was in the home shortly before the execution of the search warrant"). And similarly, this Court has found that a defendant's "possession of the *means* to exercise dominion [and] control over an item" supports a finding of constructive possession as such possession "gives the possessor dominion [and] control over the item." *Ervin*, 57 Va. App. at 504 n.5 (quoting *Wright v. Commonwealth*, 53 Va. App. 266, 274 (2009)).

But it is well-established that "ownership or occupancy of [the] premises . . . in which a controlled substance was found [does] not create a presumption that such person either knowingly or intentionally possessed such controlled substance," *Clodfelter v. Commonwealth*, 218 Va. 619, 622 (1977) (quoting Code § 18.2-250), nor is it sufficient "standing alone, to prove constructive possession," *Powers v. Commonwealth*, 227 Va. 474, 476 (1984). In particular, the Supreme Court of Virginia has instructed that such evidence, without more "creates [only] a mere suspicion" that is insufficient to support a constructive possession conviction. *Garland v. Commonwealth*, 225 Va.

182, 184 (1983). For example, in *Drew*, the Supreme Court of Virginia reversed a defendant's conviction for constructively possessing cocaine due to a lack of "statements or conduct which tend to show that [the defendant] was aware of the presence of cocaine in [his] dwelling." 230 Va. at 473. There, a law enforcement detective conducted surveillance of the defendant's residence, and "[d]uring the course of [an] hour, 22 people entered the residence, remained a short time, and left." *Id.* at 472. The surveilling officer then "acquired a search warrant and returned two hours later with several other officers" to find the defendant "standing in the street and talking with someone in a car parked" near the residence and that the cars parked at the residence were registered to the defendant and one other person. *Id.* Upon executing the warrant, the officers found clothing belonging to a man in the closet and "a checkbook, a bank statement, a telephone bill, and a wallet containing vehicle registration cards, a driver's license, and a credit union voucher" with "[a]ll these documents b[earing] [the defendant's] name and . . . address." *Id.* Afterwards, the officers found "cocaine and cocaine residue [in] several places in the house." *Id.* On the evidence of his presence at the residence alone, the defendant was convicted of constructively possessing the cocaine. *Id.* In reversing his conviction, the Supreme Court reasoned that "[a]t most, the [Commonwealth's] evidence establishe[d] that [the defendant] resided at [the residence] and that he was near the residence the night the cocaine was seized," insufficient to prove the offense without more. *Id.*

But such evidence of "[a] person's ownership or occupancy of premises on which the subject item is found, proximity to the item, and statements or conduct concerning the location of the item [are] probative factors to be considered in determining whether the totality of the circumstances supports a finding of possession." *Watts*, 57 Va. App. at 232. To wit, proximity of the contraband to the defendant or the defendant's conduct concerning the location of the contraband can be especially probative where it is found "open and obvious to someone looking in the [defendant's occupied space]" or where it is "located in immediate proximity to where [the

defendant] had been sitting." *Smallwood*, 278 Va. at 632 (quoting *Bolden v. Commonwealth*, 275 Va. 144, 149 (2008)). And where the drugs are found in the open, "[a] factfinder is permitted to infer that 'drugs are a commodity of significant value, unlikely to be abandoned or carelessly left in an area.'" *Ervin*, 57 Va. App. at 517 (quoting *Ward v. Commonwealth*, 47 Va. App. 733, 753 n.4 (2006)).

Here, viewing the evidence in the light most favorable to the Commonwealth, we conclude that sufficient evidence in the record existed to support a finding that Fitzgerald was aware of the presence of the cocaine baggies on his bedroom nightstand.[21] Foremost, Fitzgerald identified the substance within the baggies as "cocaine" when asked and he noted that he had "smoked some of it." He also told law enforcement that he was an on-and-off again user of "hard," otherwise known as crack cocaine, who had recently relapsed for the last three to four years. And, when asked by Sergeant Harn whether there was any contraband in the house, Fitzgerald initially denied having any, but when pressed, he later admitted that he "smoked hard from time to time and that he usually smokes in the kitchen if there was going to be any it would be in the kitchen." And he further admitted to working for Miller *in return for cocaine*. These adoptive overt admissions pertaining to the contraband were robust evidence supporting a finding that Fitzgerald possessed the baggies and knew what was inside of them. *See, e.g.*, *Ritter v. Commonwealth*, 210 Va. 732, 741-42 (1970) (finding that a defendant's admission: "It must be mine, it's got my name on it," when questioned about a package of marijuana found in his family's mailbox was sufficient to establish constructive joint possession of the drugs). And, as the jury rejected Fitzgerald's claim of innocence with this evidence in the record, we must

---

[21] Also, at a bare minimum, Fitzgerald's admission of ownership of the shotgun found in his closet and admissions to knowing of the contraband's locus in the house and his previous use of "hard" are even strongly suggestive of Fitzgerald's actual possession of both the firearm and the contraband in question. But we need not reach that issue in light of the record before us.

interpret the discrepancy between his statements pertaining to the existence of the contraband "as [a] mere fabrication[] to conceal his guilt," *Staton v. Commonwealth*, 36 Va. App. 282, 289 (2002), that in turn serves as "affirmative evidence of guilt," *Ervin*, 57 Va. App. at 516 (quoting *Haskins v. Commonwealth*, 44 Va. App. 1, 10 n.3 (2004)). Thus, Fitzgerald's ample adoptive admissions and contradictory statements to law enforcement regarding the contraband supported his constructive possession conviction as they showed both familiarity with the substance and its presence in his residence. *See, e.g.*, *Christian*, 59 Va. App. at 613 (finding defendant was aware of the presence of the contraband where he told law enforcement he "found the crack cocaine on the ground" and admitted that he picked it up because "he 'thought it was drugs' and that he 'thought he might be able to get four or five dollars for it"). But that is not all the record shows.

Further, the record also demonstrates that Fitzgerald had the key to the residence, he claimed ownership of the bedroom where the baggies were found, his other possessions were in the room (including his shotgun), and he was present in the room when the baggies were found by law enforcement. *See, e.g.*, *Birdsong*, 37 Va. App. at 609-10. Hence, by Fitzgerald's claim of ownership alone, the Commonwealth displayed that Fitzgerald had at least "the means to exercise dominion [and] control" over the baggies at the time they were found. *Ervin*, 57 Va. App. at 504 n.5 (quoting *Wright*, 53 Va. App. at 274). In addition, the baggies were found out in the open on the nightstand next to Fitzgerald's bed, which served as evidence against the contraband being left there inadvertently, and supported the inference that Fitzgerald, who owned and used the room, controlled the substance. *See, e.g.*, *id.* at 517. Hence, Fitzgerald's proximity to the contraband and the circumstances showing his dominion and control of the area further support a conclusion that he constructively possessed the baggies. Thus, Fitzgerald's statements, as well as his proximity to and control of the area where the drugs were found serves as abundant support for the jury's verdict convicting Fitzgerald of constructive possession.

Also, we find that the caselaw raised by Fitzgerald does not change our conclusion. Unlike *Drew*, where the observing officer noted *22 different individuals* entering the surveilled residence, Sergeant Harn's surveillance observed Fitzgerald, Miller, and another individual walk out of the house to their vehicles then, after a short time, return to the residence before reentering for "maybe a few minutes," before departing again. 230 Va. at 473. This surveillance occurred "for a good portion of the morning," and only captured the same individuals leaving and returning to the residence. In stark contrast to the record in *Drew*, the evidence in this case shows Fitzgerald's familiarity with the substance in question, his familiarity with the residence where it was found, and his familiarity with those who went in and out of the house. It also shows that Fitzgerald was present at the time the search was conducted and when the contraband was found. Hence the facts of Fitzgerald's care are a far cry from the facts in *Drew* and other similar cases that merely "establishe[d] that [the defendant] resided at [the residence] and that he was near the residence the night the cocaine was seized" or that he kept his belongings in the house with no further connection. *Id.* Thus, *Drew* is readily distinguishable from the facts at bar.

Finally, we note that the Commonwealth was not required to exclude the explanation proffered by Fitzgerald—that Miller had planted the drugs in his room while they were out of the house—in order to prove that he constructively possessed them. *See Bagley*, 73 Va. App. at 27-28. The Commonwealth was "only required to exclude hypotheses of innocence that flow from the evidence." *Maust v. Commonwealth*, 77 Va. App. 687, 699 (2023) (en banc) (quoting *Dowden v. Commonwealth*, 260 Va. 459, 468 (2000)). And such hypotheses are questions for the fact finder. *Fary*, 77 Va. App. at 347. As we stated in *Fary*, the jury had "the decisional power 'to draw reasonable inferences from basic facts to ultimate facts,'" inferences we may not interfere with unless "they are 'so attenuated'" we find they "push 'into the realm of non sequitur[.]'" *Id.* (first quoting *Musacchio v. United States*, 577 U.S. 237, 243 (2016); and then quoting *Commonwealth v.*

*Perkins*, 295 Va. 323, 332 (2018)).  We find nothing in the record to suggest that the fact finder's inferences were attenuated here in that manner.  Therefore, giving the jury's decision its required deference, we affirm Fitzgerald's constructive possession conviction.

D. *The record contains sufficient evidence to support convicting Fitzgerald of felony eluding.*

Finally, Fitzgerald assigns error to the trial court for finding sufficient evidence in the record to convict him of felony eluding.  Specifically, he avers that the evidence shows 1) Fitzgerald "reasonably believed he was being pursued by a person other than a law-enforcement officer"; and 2) that there was insufficient support to show he "received a visible or audible signal from a law-enforcement officer to stop and drove in a willful and wanton disregard of such signal."  We disagree.

In pertinent part, Code § 46.2-817(B), which proscribes felony eluding, provides:

> Any person who, having received a visible or audible signal from any law-enforcement officer to bring his motor vehicle to a stop, drives such motor vehicle in a willful and wanton disregard of such signal so as to interfere with or endanger the operation of the law-enforcement vehicle or endanger a person is guilty of a Class 6 felony.

Further, the provision also "provides that it shall be an affirmative defense if the defendant shows he reasonably believed he was being pursued by a person other than a law-enforcement officer."  Code § 46.2-817(B).  "In Virginia, a criminal defendant typically bears the burden of 'producing evidence in support of [an affirmative defense] sufficient to raise a reasonable doubt of [his or her] guilt.'"  *Williams v. Commonwealth*, 57 Va. App. 341, 352 (2010) (alterations in original) (quoting *Tart v. Commonwealth*, 52 Va. App. 272, 276 (2008)).

Moreover, the first requirement Fitzgerald contests[22] under this statute is that "the Commonwealth must prove that 'the accused received a visible or audible signal from a law enforcement officer to bring the motor vehicle to a stop.'" *Aley v. Commonwealth*, 75 Va. App. 54, 67 (2022) (quoting *Jones v. Commonwealth*, 64 Va. App. 361, 367 (2015)). Caselaw interpreting Code § 46.2-817(B) has found the "flashing . . . lights," *id.* at 68, otherwise known as "emergency lights," *Graves v. Commonwealth*, 65 Va. App. 702, 705 (2016), displayed by law enforcement to constitute such a "visual signal," *Jones*, 64 Va. App. at 368 (noting the "blue and white lights" displayed by law enforcement constitute a visual signal whereas the use of the police car's siren constitutes an audible signal).

The second requirement challenged by Fitzgerald is that the Commonwealth must prove that the defendant "drove the motor vehicle in a willful and wanton disregard of the visible or audible signal from a law enforcement officer to bring the motor vehicle to a stop." *Jones*, 64 Va. App. at 367. Caselaw interpreting Code § 46.2-817(B) notes that "[w]illfulness and wantonness convey the idea of purpose or design, actual or constructive. . . . They are used to signify a higher degree of neglect than gross negligence."[23] *Bazemore v. Commonwealth*, 42 Va. App. 203, 222 (2004) (quoting *Thomas v. Snow*, 162 Va. 654, 660 (1934)). Thus, for a defendant to be found guilty of willful or wanton conduct under Code § 46.2-817(B), the Commonwealth must show the defendant acted with "recklessness plus additional culpability." *Id.*

Here, viewing the evidence in the record in the light most favorable to the Commonwealth, we find ample support for the fact finder's conclusion that Fitzgerald knew he was being pursued by

---

[22] Here, Fitzgerald does not contend that his conduct in driving away from the traffic stop did not endanger a person. Thus, we will focus our analysis solely on his contentions.

[23] As a consequence, in the context of Code § 46.2-817(B), "the intentional violation of a traffic law, without more, will not support a finding of willful and wanton negligence." *Bazemore v. Commonwealth*, 42 Va. App. 203, 223 (2004) (quoting *Alfonso v. Robinson*, 257 Va. 540, 545 (1999)).

law enforcement and eluded the officers in a willful and wanton manner. At trial, Officer Taylor testified that in performing the traffic stop he pulled his "marked police vehicle" in behind Fitzgerald's Chevy Malibu with the emergency lights activated, which were visible from "three hundred and sixty degrees" around the vehicle. His account was supported by body-worn camera footage from the officers who approached Fitzgerald's car and dashboard camera footage from Officer Marlowe's vehicle that assisted with the stop—all evidence before the jury. The record also contained evidence that Officer Taylor, Officer Lancaster, and another uniformed officer then left their patrol vehicle to effectuate the arrest, with Officer Lancaster shown, while "wearing a ballistic vest that said police," knocking on the Chevy Malibu's passenger window before attempting to open the door to seize Miller. The video footage then documented the Chevy Malibu "back[ing] up" and then "spe[e]d[ing] off" at such a speed that the officers heard the tires "squealing," with Officer Marlowe failing to corral the Chevy Malibu before it escaped the scene. Sergeant Harn testified that he observed Fitzgerald drive away and that the car was going approximately "sixty miles an hour in a twenty-five an hour residential zone" at the time it fled the scene. And the Commonwealth introduced evidence that showed a surveillance plane monitored Fitzgerald's vehicle driving out of Danville, through Pittsylvania County, until the Chevy Malibu reached Lawless Creek Road in Blairs, Virginia. But this was not all the evidence in the record supporting Fitzgerald's conviction.

Moreover, Fitzgerald stated during his interview that he initially fled because "he did not see the lights behind him and then later said that he just got scared and drove off." But he later conceded to Sergeant Harn "that he seen the blue lights pull up behind him." He also admitted that because of seeing the lights, "[Miller] said drive, drive," and he did exactly that. These admissions weigh directly against Fitzgerald's contention that because Officer Lancaster was wearing a vest and civilian clothes, Fitzgerald could have reasonably believed he was being

- 39 -

pursued by someone other than law enforcement. "[A] fact-finder, having rejected a defendant's attempted explanation as untrue, may draw the reasonable inference that his explanation was made falsely in an effort to conceal his guilt." *Maust*, 77 Va. App. at 703 (quoting *Covil v. Commonwealth*, 268 Va. 692, 696 (2004)). Thus, the fact finder here was permitted to consider that "[Fitzgerald's several] statements were inculpatory in the [felony eluding] conviction[, which] made the Commonwealth's case much stronger." *Zektaw v. Commonwealth*, 278 Va. 127, 140 (2009). And these statements also reinforce Fitzgerald's failure to prove the "affirmative defense," as they directly contradict his position that he was followed by someone other than law enforcement. *Williams*, 57 Va. App. at 352-53.

In point of fact, Fitzgerald even noted in his police interview that Miller knew Officer Lancaster particularly by name from previous police encounters and also knew that Officer Lancaster was the officer attempting to apprehend him. Thus, when Fitzgerald "pull[ed] off" at Miller's urging, a reasonable juror could infer Fitzgerald knew that the phrase meant to attempt to evade law enforcement. When asked why he drove the vehicle to Blairs, Virginia, which was documented by surveillance plane footage, Fitzgerald responded that he did so because Miller "wanted him to drive that direction to lose law enforcement." And these statements and his other admissions permitted the jury to "reasonably infer [Fitzgerald's] 'consciousness of guilt' from his efforts to avoid detection following the [traffic stop]." *Aley*, 75 Va. App. at 68. These statements, coupled with Sergeant Harn's testimony that he observed Fitzgerald drive away from the scene at 35 miles per hour over the speed limit in a residential area, supported the fact finder's reasonable inference that Fitzgerald willfully fled in a wanton manner.

Thus, there is overwhelming evidence in the record that supports the reasonable inference 1) that Fitzgerald did not reasonably believe that he was being pursued by someone other than law enforcement, and 2) that he drove away from the scene willfully and in a wanton manner.

The jury "determines which reasonable inferences should be drawn from the evidence." *Maust*, 77 Va. App. at 703 (quoting *Moseley*, 293 Va. at 464). Thus, we are compelled to conclude that Fitzgerald failed to show that the jury's conclusion "was . . . plainly wrong or without evidence to support it." *Fary*, 77 Va. App. at 350. Hence, we affirm his conviction for felony eluding.

## III. CONCLUSION

In sum, in light of the record before the trial court and the parties' various contentions, we find no error. Though the facts presented in this case are not identical with those analyzed in *Ginevan* and *Watkins* since the firearm was found with the contraband in question in Fitzgerald's bedroom, we do find both cases instructive here because they show that Code § 18.2-308.4 is consistent with the Supreme Court of the United States's guidance in *Heller*, *Bruen*, and *Rahimi*. Bolstering that conclusion, we also find that Code § 18.2-308.4 has a historical analogue in the traditional regulation against smuggling contraband—which included controlled substances like alcohol, and stretched from before the Founding beyond Reconstruction. Thus, Fitzgerald's as-applied constitutional challenge falters and since we further find Fitzgerald's remaining assignments of error unpersuasive, the trial court's judgment is affirmed on all grounds.

*Affirmed.*